FILED
2013 MAR 27 A 10:55
CLERK
U.S. BANKRUPTCY
COURT - PGH

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| THOMAS C. WETTACH, | : | Case No. 05-38188-TPA (file at) |
| *Debtor* | : | Chapter 7 |
| | : | Related to Doc Nos. 46, 47 |
| | | |
| JEFFREY J. SIKIRICA, Ch. 7 TRUSTEE, | : | |
| *Plaintiff* | : | Adv. No. 07-2519-TPA |
| | : | |
| v. | : | |
| | : | |
| THOMAS C. WETTACH and | : | |
| BETTE C. WETTACH, | : | |
| *Defendants.* | : | |

Appearances:    John P. Vetica, Jr., Esq.,  for Plaintiff, Jeffrey J. Sikirica, Trustee and
                         TrizecHahn Gateway, LLC
                  James Cooney, Esq., for Defendants, Thomas C. Wettach and Bette C. Wettach


**MEMORANDUM OPINION**


**INTRODUCTION**


This Adversary Proceeding and  related objections to exemptions are part of a series

of cases informally known to the Court as the "Titus" cases because they all involve certain

attorneys who were partners in the former Pittsburgh law firm of Titus & McConomy, LLP

(T&M").[1] T&M and some of its partners individually, were sued for breach of a lease agreement

---

[1]    *See,  In re Paul H. Titus*, Case No. 10-23668 and *Böhm v. Titus*, Adv. No. 10-2338; *In re Thomas D. Arbogast*, Case No. 10-20237 and *Cardiello v. Arbogast*, Adv. No. 10-2092;  *In re David G. Oberdick*, Case No. 08-20434 and *Shearer v. Oberdick*, Adv. No. 08-2155; and *In re David I. Cohen*, Case No. 05-38135 and *Sikirica v. Cohen*, Adv. No. 07-2517. T&M  was itself also a debtor in this Court.  *See In re Titus & McConomy, LLP*, Case No. 03-25332, closed on November 29, 2007.

1

by TrizecHahn Gateway, LLC ("Trizec"), which ultimately secured a joint and several judgment against T&M and its partners.  Trizec then began pursuing execution on the judgment and some of the partners ended up in bankruptcy, either voluntarily or involuntarily.  The issues raised in the Titus cases revolve around allegations of fraudulent transfer in connection with the disposition of the partners' post-T&M earnings vis-a-vis the Trizec judgment, as well as objections to exemptions.

All of the Titus cases were originally assigned to the Hon. M. Bruce McCullough, and upon his death in late 2010 they were reassigned to the Hon. Bernard Markovitz.  Judge Markovitz conducted trials in all of the Titus cases during 2011, including the present matter which was tried on November 30, 2011.  Judge Markovitz issued  memorandum opinions in two of those cases.  *See*,  *In re Arbogast*, 466 B.R. 287 (Bankr. W.D. Pa. 2012), aff'd., 479 B.R. 661 (W.D. Pa. 2012) and  *In re Titus*, 467 B.R. 592  (Bankr. W.D. Pa. 2012), motion to amend denied by 479 B.R. 362 (Bankr. W.D. Pa. 2012).  Before he could render decisions in the remaining Titus cases, however, Judge Markovitz retired from the bench and those cases were reassigned to the Undersigned.[2]

Upon being assigned the Titus cases, the Court was  somewhat uncertain as how best to proceed with respect to the matters for which Judge Markovitz had conducted trials, but not yet issued decisions at the time of his retirement.  The Court initially thought the matters might need to be retried.  However, at a *Status Conference* held on March 26, 2012, the Parties in the affected Titus cases all consented to the Court making findings of fact and conclusions of law based solely

---

[2]        The *Cohen* matter was subsequently transferred to the Hon. Jeffery A. Deller on July 13, 2012, and he has issued a decision in that case.  *See*,  *In re Cohen*, 2012 WL 5360956 (Bankr. W.D. Pa. 2012), *aff'd. in part, vacated in part, remanded* by *Cohen v. Sikirica*, 2013 WL 772705 (W.D. Pa. Feb. 28, 2013).

on its review of the pleadings, post-trial briefs, trial transcript and exhibits.  *See*, *Order* of March

27, 2012, Adv. Doc. No. 121.    Pursuant to *Fed.R.Bankr.P. 7052*, the within  *Memorandum Opinion*

sets forth the Court's findings of fact and conclusions of law as to the pending matters following

such review.[3]

　　　　　For the reasons set forth below, the Court finds in favor of the Trustee as to certain

of his claims in the fraudulent transfer action.  The Court will also sustain, in part, and overrule, in

part, the *Objections* to exemption made by the Trustee and Trizec.

## STATEMENT OF FACTS

　　　　　One of the Defendants in this case is the Debtor, Thomas C. Wettach,  an attorney

who at one time was a partner of T&M.  The other Defendant is Bette C. Wettach, the wife of the

Debtor.

　　　　　T&M formerly rented office space in a building owned by Trizec.  On July 28, 2000,

Trizec filed a lawsuit against T&M in the Pennsylvania Court of Common Pleas for Allegheny

County (hereafter "the Common Pleas Court").    Trizec filed such lawsuit (hereafter "the Lease

Litigation") on the basis that T&M had breached its lease agreement with Trizec.  In addition to

---

[3]　　　These are core matters under  *28 U.S.C. §157(b)(2)(A)* and *(H)*.  The  Court's jurisdiction to hear and
decide these matters under *28 U.S.C. §1334* was not disputed.  The Defendants initially challenged the Court's power
to render this decision on the basis of the holding in *Stern v. Marshall*, ___ U.S. ___, 131 S. Ct. 2594 (2011), however,
they have since withdrawn that position. *See* Defendants' Supplemental Post Trial brief at 5, Adv. Doc. No. 129.  The
Court concludes that it has the constitutional authority to enter a final judgment in these matters, or that in the alternative,
the parties have consented to the entry of a final judgment. *See*, *In re River Entm't. Co.*, 467 B.R. 808, 822- 825 (Bankr.
W.D. Pa. 2012).  Finally, if it is determined that the Court does not possess the authority to enter a final judgment, it does
have the authority to submit proposed findings of fact and conclusions of law to the District Court, and this *Memorandum
Opinion* should be construed as such.

T&M itself, Trizec also named as defendants in the Lease Litigation approximately 20 individual partners of T&M, including the Debtor.

On June 7, 2006, the Common Pleas Court entered a joint and several judgment in the Lease Litigation in favor of Trizec and against certain of the defendants, including the Debtor. The base amount of such judgment was approximately $2.7 million. The Lease Litigation judgment was subsequently appealed to the Pennsylvania Superior Court. Although that court affirmed the Common Pleas Court's decision as to most of the named defendants, it reversed as to the Debtor, finding that he had signed the lease in a representational capacity that protected him from personal liability based on an "absolution clause" in the lease. See, *Trizechahn Gateway, L.L.C. v. Titus*, 930 A.2d 524 ( Pa. Super. July 3, 2007). That decision was further appealed to the Pennsylvania Supreme Court, which reversed the Superior Court and reinstated the Debtor's liability. *See*, *Trizechahn Gateway, L.L.C. v. Titus*, 601 Pa. 637, 976 A.2d 474 (July 22, 2009), reversing in part and remanding.

In the meantime, as the Lease Litigation was ongoing, the Debtor filed a bankruptcy petition under Chapter 7 on October 14, 2005. In Schedule B of his petition, the Debtor listed personal property with a total value of $2,951,000, which may be summarized as follows:

| | | |
|---|---|---:|
| • | PNC checking account | $ 22,000 |
| • | Household goods | 10,000 |
| • | Books and pictures | 3,000 |
| • | Photography equipment | 2,000 |
| • | Guardian life ins. policy | 135,000 |
| • | IRA-IBS Financial Services | 1,300,000 |
| • | IRA-Merril Lynch | 945,000 |
| • | Cohen & Grigsby 401(k) pension plan | 275,000 |
| • | Stocks | 150,000 |
| • | Loan repayment due | 23,000 |

4

- Motor vehicles                                             84,000
- Office equipment                                            2,500

TOTAL                                          $ 2,951,000

The Debtor claimed all of this property as exempt in Schedule C, most of it on the
basis that under Pennsylvania common law it was owned jointly with his wife as entireties property,
and the rest (the IBS Financial IRA, the Guardian life insurance policy, and the C&G pension plan)
on the basis of *42 Pa. C.S.A. §8124(b)* or *(c)*.  On Schedule F, the Debtor listed a $3,000,000
unsecured claim by Trizec against him , and listed  $3,000,000 unsecured claims against him buy
each of the other T&M partners who had also been found jointly and severally liable to Trizec in the
Lease Litigation.[4]

On May 16, 2006, Trizec filed precautionary **Objections to Debtor's Exemptions**,
Doc. No. 46, claiming that it had not yet received its requested documentation concerning the
claimed exemptions, and due to an impending deadline, wanted to preserve its right to object.  The
Chapter 7 Trustee likewise filed an **Objection to Debtors' Exemptions**, Doc. No. 47, the next day
on a precautionary basis for the same reason.  (The two filings will be referred to hereinafter
collectively as the "*Objections*").  Because of the precautionary nature of the *Objections*, they did
not clearly articulate a basis for objecting to any of the claimed exemptions, merely stating that
Trizec and the Trustee were awaiting documentation.

The Trustee commenced a fraudulent transfer adversary proceeding against the
Defendants by filing a Complaint on October 15, 2007 (the "Wettach FTA").   The currently

---

[4]         Apparently these claims were listed due to potential indemnity causes of action that the T&M partners
had voluntarily agreed to among themselves if any partner paid more than his or her proportional share of the Trizec debt.

operative pleading in the case is an ***Amended Complaint*** that was filed on February 14, 2010, Adv.

Doc. No. 50.  The *Amended Complaint* contains three counts under the *Pennsylvania Uniform*

*Fraudulent Transfer Act* ("PaUFTA"), *12 Pa. C.S.A. §§5101, et. seq*.  Count I pleads an action for

fraudulent transfer with actual intent under *12 Pa.C.S.A. § 5104(a)(1))*, Count II pleads constructive

fraudulent transfer under *12 Pa.C.S.A. § 5104(a)(2)(ii)*, and Count III also pleads constructive

fraudulent transfer, this time under *12 Pa.C.S.A. §5105*.[5]  The Trustee is authorized to pursue the

Wettach FTA pursuant to *11 U.S.C. § 544(b)(1)*, which allows a bankruptcy trustee to "avoid any

transfer of an interest of the debtor in property ... that is voidable under applicable [nonbankruptcy]

law by a creditor holding an unsecured claim [against said debtor's bankruptcy estate]."

      The gist of the Wettach FTA, as set forth in the *Amended Complaint,* is that the

Debtor engaged in fraudulent transfers when, subsequent to the initiation of the Lease Litigation in

---

[5]     *12 Pa.C.S.A. §§ 5104(a)(1)* and *(2)(ii)* provide, in pertinent part, that:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor,
whether the creditor's claim arose before or after the transfer was made or the
obligation was incurred, if the debtor made the transfer or incurred the obligation:

    (1)  with actual intent to hinder, delay or defraud any creditor of the
       debtor; or

    (2)  without receiving a reasonably equivalent value in exchange for the
       transfer or obligation, and the debtor:

        ...
        (ii)  intended to incur, or believed or reasonably should have
        believed that the debtor would incur, debts beyond the debtor's
        ability to pay as they became due.

*12 Pa.C.S.A. §5105* provides that:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor
whose claim arose before the transfer was made or the obligation was incurred if the
debtor made the transfer or incurred the obligation without receiving a reasonably
equivalent value in exchange for the transfer or obligation and the debtor was
insolvent at that time or the debtor became insolvent as a result of the transfer or
obligation.

July 2000, he caused his individual compensation from the law firm of Cohen & Grigsby, P.C. ("C&G") (where he became a shareholder and employee after T&M was dissolved), to be deposited into various accounts and business interests held jointly with his wife as entireties' property, some of which were then used to acquire other assets. The contention is that such deposits constituted "transfers" under *PaUFTA*, and that such transfers by the Debtor were fraudulent, either actually or constructively so, because they were made without him receiving a reasonably equivalent value in exchange, and had the effect of shielding the Debtor's individual compensation from the reach of his individual creditors, such as Trizec, by converting it into entireties' property.

The Trustee is seeking a variety of relief in the Wettach FTA, stating that he "seeks all remedies available ... pursuant to *12 Pa. C.S.A. §5107*." A number of specific remedies are listed, including an avoidance of the allegedly fraudulent transfers, an attachment of all fraudulently-transferred assets, an injunction against any further transfers, allowing the Trustee to levy execution on the fraudulently-transferred assets, and a monetary judgment against both the Debtor and Mrs. Wettach for the amount of the transfers to be avoided as fraudulent.

In pursuing the Wettach FTA, the Trustee relies heavily on the decision in *In re Meinen*, 232 B.R. 827, 840–43 (Bankr.W.D.Pa.1999) for his position that a debtor's transfers of his individual compensation into an entireties' account or other entireties' property can constitute fraudulent transfers. The *Meinen* decision and the cases cited therein do indeed generally support the Trustee's position, provided that such deposited compensation was not then utilized to satisfy reasonable and necessary household expenses for the maintenance of the debtor's family.

7

The Defendants initially responded to the *Amended Complaint* by filing a motion to dismiss, Adv. Doc. No. 50.  The Defendants raised a number of arguments in that motion, including an argument that one of the *PaUFTA* provisions, *12 Pa.C.S.A §5109*, is a statute of repose that would act to eliminate any claim  based on a transfer that occurred more than four (4) years prior to the date of the filing of the Wettach FTA, *i.e.*, any transfer made prior to October 15, 2003.[6]  The Defendants therefore asked for a dismissal with respect to any transfers occurring before that date. Judge McCullough, who was then handling the case, denied the motion to dismiss, with prejudice. He did not set forth his reasoning with respect to the other arguments for dismissal that the Defendants had made, but he did hold as follows with respect to the statute of repose argument:

> (b)   Irrespective of any potential application to the instant matters of any tolling doctrine vis-a-vis the 4 year limitations period set forth in 12 Pa. C.S.A. 5109, such limitations period, when applied to the instant adversary proceedings regarding Debtors Thomas Wettach and David Cohen, does not operate to bar Plaintiff's avoidance actions to the extent that they pertain to any alleged fraudulent transfers that occurred within the 4-year period that precedes the dates upon which Wettach's and Cohen's bankruptcy cases were commenced, *In re Cowden*, 337 B.R. 512, 522 (Bankr. W.D. Pa. 2006) - i.e., §5109 does not operate to bar such actions respecting debtors Thomas Wettach and David Cohen to the extent that such actions pertain to such transfers that occurred between October 14, 2001 and October 14, 2005;

*See* May 25, 2010 Order, Adv. Doc. No. 59 at Paragraph (b).

Following the denial of their motion to dismiss, the Defendants then filed an Answer to the *Amended Complaint*. The Defendants alleged that the transfers in question were consistent

---

[6]      The motion to dismiss incorrectly stated that the adversary proceeding had been filed on November 15, 2007, rather than the correct date of October 15, 2007, so it argued that transfers made prior to November 15, 2003, were eliminated by *Section 5109.*  The Court assumes this was inadvertent and uses the corrected dates.

with the historic practice they had followed since the inception of their marriage and denied any fraudulent intent.   They also raised several affirmative defenses, including ones related to insolvency, discharge of the Trizec debt as precluding the Wettach FTA, and the statute of repose.

As was indicated above, the Wettach FTA and the *Objections* were tried jointly on November 30, 2011.  In a subsequent post-trial brief,  the following summary of the "damages" still being sought by the Trustee in the Wettach FTA and by the Trustee/Trizec in the *Objections* is provided:

| | | |
|---|---|---|
| 1. | Income/Inheritance Estate of William Wettach | $    66,722.62 |
| 2. | Guardian Life: increase in cash value | 148,581.88 |
| 3. | C&G severance benefit | 16,830.28 |
| 4. | C&G pension contributions | 204,503.28 |
| 5. | Expenses in excess of necessities, misc. investments | 82,500.09 |
| 6. | Expenses in excess of necessities: entertainment/travel | 75,476.22 |
| 7. | Expenses in excess of necessities: auto | 134,706.02 |
| 8. | Expenses in excess of necessities: housing | 178,508.21 |
| 9. | Expenses in excess of necessities: contributions | 27,595.62 |
| 10. | Expenses in excess of necessities: allowances | 54,755.00 |
| 11. | Bank account balances at filing | 49,837.67 |
| | TOTAL | $  1,040,016.89[7] |

*See* Adv. Doc. No. 116 at 13.  The post-trial brief does not indicate which of these items are being sought pursuant to the Wettach FTA, and which pursuant to the *Objections*.  It would, of course, have been preferable for that to have been done but the Court will make do with the evidence and argument as presented.

---

[7]    Going into the trial, the Trustee had been seeking a total recovery of $1,692,074.35.  The large bulk (more than $530,000) of the reduction as shown in the post-trial brief came from the Trustee's decision to abandon any claim related to a Merrill Lynch Investment Account.

## DISCUSSION

### *A.*    *Legal Principles to be Applied*

The Court does not reach its decision in this case in a vacuum.  Many of the same legal issues presented here have previously been addressed in other of the Titus cases.  *See,* particularly, the bankruptcy court decision in *Arbogast* (466 B.R. 287), the affirmance of that decision by the district court (479 B.R. 661), the bankruptcy court decision in *Titus* (467 B.R. 582), the bankruptcy court decision in *Cohen* (2012 WL 5360956), and the partial affirmance and partial vacation with remand of that decision by the district court (2013 WL 772705).  *See also* this Court's decision in *Oberdick* being released this same date.

All of these cases have resulted in a fairly settled view as to a number of basic legal principles to be applied in deciding matters of the nature presented here.  The Court will briefly set forth these underlying principles, before turning to an application of them based on the specific facts of the present case.

### A. (1)    *Transfer of Individual Compensation into Entireties Property*

The essential holding of *Meinen, supra*, is recognized as the applicable law.  That is to say, the deposit or payment of individual debtor compensation into an entireties account or other entireties' property may constitute a fraudulent transfer for purposes of *PaUFTA* unless such payments or deposits were subsequently spent on "necessities" for the marital unit.[8]  Both the Debtor

---

[8]    An alternate view, as expressed by the state court in some of the Titus cases before they came into the bankruptcy court, to the effect that such transfers would only be fraudulent transfers to the extent they were subsequently spent on "luxuries," is therefore rejected.

and his spouse  are deemed to be "initial transferees" of such deposits or payments regardless of

whether: (a) she is the one who later spent such deposits; and, (b) that which was purchased with

such deposits actually benefitted her. Therefore, to the extent that such deposits are determined to

constitute fraudulent transfers, the Trustee may obtain a joint and several money judgment against

both the Debtor and Mrs. Wettach in the amount of such value, pursuant to *§550(a)(1).*   *See,*

*generally, Arbogast*, 466 B.R. at 306-07.


### A. (2)    *Burden of Proof*

As part of his prima facie case, the Trustee must prove by a preponderance of the

evidence that the Debtor caused the transfers in question to be made into an entireties' account or

other entireties' property.  He must also show by a preponderance of the evidence that the Debtor

failed to receive reasonably equivalent value in exchange for the transfer of his individual

compensation into entireties' property, or, in other words, the Trustee must show that the transferred

funds were not used to satisfy necessities or were spent on other assets that are presently held as

entireties' property.  *See Arbogast*, 466 B.R. at 308; *Cohen* (D.Ct.), 2013 WL 772705 at *3-4.  The

Trustee must also prove by a preponderance of the evidence that the Debtor was insolvent at the time

of the transfers, or was thereby rendered insolvent.  *Cohen, at *2.*  The Defendants, however, have

the burden of producing at least some useful evidence to demonstrate how they spent the transferred

funds, and absent such evidence the trustee will be deemed to have met his burden of proof as to

reasonably equivalent value. *Cohen, id.*

11

### A. (3)     Consequence of other Funds Going Into an Account

Because of the nature of an account in which deposits are made from multiple sources, it may not be possible, or at the very least would be difficult, to show what deposits were used for what expenditures.  In other words, if deposits into an entireties' account are made up of both a debtor's individual compensation, as well as funds from some other source that would not constitute a potential fraudulent transfer (e.g., the spouse's compensation), it may be impossible to determine what deposit was used for a particular expenditure.  When confronted with that reality in *Titus*, Judge Markovitz therefore concluded that it was as least as likely as not that the "other" deposited funds were used toward any non-necessary expenditures, meaning that the Trustee would have failed to meet his burden to that extent. *Titus*, 467 B.R. at 624.  This, in effect, means that for such other deposits, the Defendants get a dollar-for-dollar reduction against any liability they would otherwise have.  While the Court has some reservations about this approach (see the discussion on this point in *Oberdick*), it was approved by the district court in *Cohen* and will be followed here.

### A. (4)     Insolvency

The constructive fraudulent transfer statutes upon which the Trustee relies are conditional and do not apply to every transfer.  Under *12 Pa.C.S.A. § 5104(a)(2)(ii),* the Trustee must show that the Debtor "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."  Under *12 Pa. C.S.A. §5105,* the Trustee must show that  the Debtor was insolvent at the time of the transfers, or was rendered insolvent as a result of the transfers.  In other words, if the Trustee fails to show the

12

existence of these conditions he cannot prevail even if transfers otherwise within the scope of the

statute occurred.   It therefore makes sense to first examine whether the Trustee has proven the

existence of these conditions, and only then, if necessary, to turn to other questions surrounding the

transfers.

The Defendants argue that the Trizec debt itself cannot be counted as a liability of

the Debtors for purposes of the *PaUFTA* insolvency analysis because Trizec's claim was the subject

of a bona fide dispute until June 7, 2006, when a final judgment was rendered in the state court

Lease Litigation – a date well after the October 14, 2005 filing of the Debtor's bankruptcy petition.

Similar arguments have been made, and rejected, in the other Titus cases. For instance, as noted in

the *Oberdick* opinion also filed this date, Judge Jeffrey A. Deller of this Court dealt with this very

issue in *Cohen* and concluded that the effective date of the Trizec debt for insolvency purposes was

July 2000, when the Lease Litigation was filed.   He noted that *PaUFTA* provides that a "debt" is

"liability on a claim", with claim defined broadly as a "right to payment," to include even those that

are unliquidated, or disputed, or not reduced to judgment. *Cohen* (B. Ct.) 2012 WL 5360956  at *8.

The Court agrees with that conclusion.   Since all of the challenged transfers in the present case

occurred after the initiation of the Lease Litigation, and since the Debtor acknowledged being aware

of the Lease Litigation and that it involved a claim of over $2 million by no later than August 2000,

the full amount of the Trizec claim can be counted as a liability of the Debtor's for insolvency-

testing purposes.   *See Tr. Tran*. at 14, l. 22 through 15, l. 1.

The Trustee  elicited an admission from the Debtor that all of the assets  he had listed

in Schedule B of his petition were either owned by the entireties or were exempt under non-

13

bankruptcy law, such that, as defined under *PaUFTA,* he had no assets during the period from 2001 to 2005. *See Tr. Tran.* starting at 120, l. 17 through 122, l. 23.

Given that the Debtor had a large personal liability during the relevant period of time, in the form of the Trizec claim, and no assets, he was therefore insolvent for purposes of *PaUFTA* beginning in 2001 and continuing at all relevant times thereafter. Likewise, given the large size of the Trizec liability and his lack of assets, the Debtor believed, or at the very minimum should have believed, that he would incur debts beyond his ability to pay them as they became due. *See Cohen* (D.Ct.) 2013 WL 772705 *10.

### A. (5)    *Effect of Discharge of the Trizec Debt*

The Debtor in this case has not yet been granted a discharge.[9] However, he notes that when such discharge is ultimately granted, it will include the Trizec debt because no complaint objecting to the discharge of that debt was ever filed, and it is now too late to do so. This is akin to the argument made by the debtor in *Oberdick,* although that debtor was in an even stronger position as to this issue because he had actually already received his discharge by the time of his fraudulent

---

[9]    A review of the docket indicates that a discharge order was actually entered on October 27, 2006, Doc. No. 64, but it was vacated four days later as having been inadvertently entered, Doc. No. 65. The Debtor filed a *Motion to Compel Issuance of a Discharge* on September 30, 2010, Doc. No. 129, while Judge McCullough still had the case. Nothing was done on that motion while he had the case. The case was then reassigned to Judge Markovitz and he scheduled the motion for a hearing on April 19, 2011, see Doc. No. 136. The Debtor filed a CNO on April 15, 2011, see Doc. No. 138. The matter just seems to have disappeared for an extended period after that for some unknown reason. The docket does not reflect that the motion was ever granted, and there is no record of a hearing having occurred on April 19, 2011. Since the Debtor has never raised the existence of this motion as an issue with the Undersigned, the Court assumed it had been abandoned and was going to deny the motion as moot, without prejudice, as a way to "clean up" the docket. Within the last few days, however, the Debtor has filed a *Renewed Motion to Compel Issuance of a Discharge,* Doc. No. 154, clearly indicating he has not abandoned his effort to obtain a discharge. By separate order, the Court will deny the motion filed at Doc. No. 129 as moot in light of the recently filed motion at Doc. No. 154 and schedule that motion for hearing. For the reasons indicated in this *Opinion,* the outcome of that motion will have no effect on the decision here.

14

transfer trial.  Despite that, the argument was rejected in *Oberdick* based on the analysis provided

by Judge Markovitz in the *Titus* and *Arbogast* decisions, which concluded that the pursuit of a

fraudulent transfer action by a bankruptcy trustee pursuant to *11 U.S.C. §544(b)(1)* transforms the

matter into a bankruptcy cause of action.  Because a bankruptcy cause of action can only be brought

post-petition, it is necessarily not a pre-petition claim and would therefore not be extinguished by

the Debtor's discharge.  *See*, *Titus*, 467 B.R. at 611-12; *Arbogast*, 466 B.R. at 307.  *See also*,

*Cohen*, (D.Ct.) 2013 WL 772705 *9.  The same conclusion applies here; any discharge the Debtor

may ultimately obtain would not extinguish his potential liability in this case.


### A. (6)    Lookback Period


The Defendants argue that any recovery in the Wettach FTA should be limited to

transfers that occurred from October 14, 2003 through October 14, 2005.  They arrive at this

conclusion in the following manner.  First, they argue that there is a four year "lookback period"

under *PaUFTA*, pointing to *12 Pa.C.S.A. §5109*.  They peg the end-date of this lookback period as

October 15, 2007, the date the adversary proceeding was filed, and conclude that any transfers

occurring before October 14, 2003, must be excluded.  Second, they argue that since the bankruptcy

petition was filed on October 14, 2005, any income earned by the Debtor after that date was not

property of the estate pursuant to *11 U.S.C. §541(a)(6)*, so any transfers made after that date cannot

be recovered.


The Court agrees that four years is the appropriate lookback period.  However, it

disagrees that this period should be counted back from the date the adversary proceeding was filed.

Rather, the lookback period should be counted back from the date of the bankruptcy filing.  *See,*

15

*Cohen* (B.Ct.) 2012 WL 5360956 *5.  In that case, Judge Deller properly found that a Chapter 7 trustee stands in the shoes of the unsecured creditors of the debtor, and so long as the applicable state law statute of limitations has not expired prior to the date the debtor files for bankruptcy, the trustee may bring an avoidance action pursuant to *11 U.S.C. §544(b)*, within the time constraints of *11 U.S.C. §546(a)*.  Judge Deller further noted that under *PaUFTA* an action to recover a fraudulent transfer must be brought within four years of the date of the transfer.  *See*, *12 Pa.C.S.A §5109*.  Under *Section 546(a)* of the Bankruptcy Code, a trustee must bring an avoidance action within 2 years of the filing of the petition.

Applying this same reasoning to the present case leads to the conclusion that when the Debtor's petition was filed, the statute of limitations under *PaUFTA* had not yet run with respect to transfers occurring from October 14, 2001 to October 14, 2005.  Furthermore, the Trustee acted within the time limit required by *Section 546(a)* when he filed the adversary proceeding on October 15, 2007.[10]  Thus, just as in *Cohen*, here the Trustee stands in Trizec's shoes and may challenge any transfers the Debtor made from October 14, 2001 to October 14, 2005.

### A. (7)    *Actual Fraud*

Although it is not strictly a general legal principle as are those discussed above, it will be convenient at this point in the *Opinion* to discuss as well the actual fraud claim made by the Trustee in Count I of the *Amended Complaint.*  A similar claim was made in the other Titus cases

---

[10]    Although two years from the date of bankruptcy filing actually expired on October 14, 2007, that was a Sunday, which allowed the Trustee until the next day, Monday, October 15, 2007, to file the adversary.  *See Fed.R.Bankr.P. 9006(a)(2)(C).*

16

and the Court here is going to dispose of that claim in just the same manner as has been done in all

of those other cases.  In short, the Court finds that the Trustee has failed to prove that the Defendants

engaged in actual fraud pursuant to *12 Pa.C.S.A. §5104(a)(1)*.  The reasons for that conclusion, as

stated in detail in the *Oberdick* opinion being issued this date, are equally applicable in the present

case,  and no purpose would be served by restating them verbatim here.  Very briefly, the Court will

note that it is relying upon the finding as expressed by Judge Markovitz in *Arbogast*, after having

had the opportunity to personally evaluate the demeanor and credibility of the Defendants, that he

found no suggestion of an actual fraudulent intent.  The Court's own, independent review of the

record in this case is no different.  Thus, only the constructive fraudulent transfers remain in the

Wettach FTA, and it is to those, and the *Objections*, to which the Court now turns.

## B.    *Analysis of the Particular Claims*

The Court may now apply the general legal principles as set forth above to the

particular facts of this case.  As a starting point with respect to the Wettach FTA, the Trustee was

required to prove the fact and amount of "transfers" from individual Debtor compensation, into an

entireties' account of the Defendants', that occurred during the lookback period, previously

determined to be from October 14, 2001 to October 14, 2005.  This, of course, represents only a

"gross" amount, which would be subject to a further reasonably equivalent value analysis, which

could include possible downward adjustments to reflect expenditures for necessities, other sources

of deposits into the same account, etc.  Nevertheless, without a proven gross amount as a place to

begin, the Court is hard-pressed to see how any relief can be provided to the Trustee.

The Court notes that the adequacy of the Trustee's proof as to the gross amount of transfers was not initially raised as an issue by the Defendants when they filed their post-trial brief. However, after the Court itself raised this issue in the *Oberdick* case, the Defendants filed a Supplemental Post Trial Brief, Doc. No. 144, in which they now argue that there is no evidence in the record regarding the amount of the Debtor's C&G income that was deposited into the Defendants' entireties' account during the lookback period, and they say they are not able to agree on such amount.

In *Oberdick* the Trustee eventually filed a motion to supplement the trial record, seeking to include in the record two additional exhibits that would have provided some considerable clarity as to the amount of Debtor deposits. In a separate Opinion also being issued this date, the Court denies the Trustee's motion to supplement the record in *Oberdick*. That denial does not, however, result in a finding that the Trustee in *Oberdick* failed to prove the essential element of the amount of deposits, although that was an option certainly considered by the Court. Instead, starting with the undisputed fact that deposits had occurred, and albeit with some difficulty in "connecting the dots" that could have easily been avoidable, the Court was able to determine that the Trustee had met his burden of proof with respect to an amount of deposits based solely on the existing trial record.

Just as in *Oberdick*, the Trustee in the present case appears to have contemplated the introduction of an exhibit at trial to directly establish the amount of deposits that were made into the Defendants' entireties' account. *See* the Joint Pretrial Statement, Doc No. 111, listing an Exhibit 23 described as "Schedule of Deposits with source documents Thomas C. Wettach Employment."

18

Again, just as in *Oberdick*, the Trustee here failed to introduce that exhibit into the record at trial, and otherwise failed to directly establish the amount of deposits.[11]  Unlike in *Oberdick*, the Trustee in the present case has not sought to supplement the trial record.  The Court must therefore determine whether on the existing record the Trustee has met his burden of proof in this regard.

The fact of the Debtor's deposit of his C&G compensation into an entireties' account is clearly established by the record.  *See, e.g.*, Answer to *Amended Complaint* at  ¶¶ 12, *et. seq*. (acknowledging the fact of the deposits, but disclaiming any fraudulent intent or other impropriety in doing so), and affirmative defenses, *id.* at  ¶¶ 51, et. seq. (same).  At trial, the Debtor testified as follows:

> Q.     Okay. And the income you generated in these years [2001 through 2005] was deposited into your joint account at PNC?
> A.     The firm deposited money into the account.
> Q.     It was deposited into your account at PNC by your firm, because you directed that they deposit it there.  They didn't do it because they thought it was a good idea. They did it because you directed them to.
> A.     They asked me how I wanted it done.
> Q.     And you told them?
> A.     I agreed, that's the way I preferred it.

*Tr. Tran.* at 120, lines 6-15.  Although not expressly so stated by the Debtor, the Court finds this to be sufficient as an admission that all of the Debtor's C&G compensation was deposited into the entireties' account, except to the extent that the record may show otherwise.

The total amount of these transfers made during the lookback period is more difficult to determine.   The Defendants' income tax returns for 2001 through 2005 were introduced as

---

[11]     The Court will not speculate as to why the Trustees in the two cases would have listed these exhibits yet then not sought to introduce them at trial, except to note that the fact that it happened in two cases perhaps makes it more likely to have been the result of some deliberate strategy rather than simply an oversight.

exhibits.  The testimony of the Defendants established that  Mrs. Wettach herself had no, or only *de minimus*, earned income during this period, and made no deposits into the entireties' account.  *Tr. Tran.* at 119, l. 12 through 120, l.5; 162, lines 10-12.  Thus, the Court concludes that the Trustee has met his burden of proof by showing that the amounts listed on line 7 of the tax returns (wages, salaries, tips, etc.) reflect the individual income of the Debtor that was deposited into the entireties' account.  These amounts are as follows:

| | |
|---|---|
| 2001 | $376,358 |
| 2002 | $202,122 |
| 2003 | $365,305 |
| 2004 | $242,597 |
| 2005 | $216,334 |

*See*, Exhibits 10-14.

The returns for 2002 through 2004 are completely within the lookback period and can be added *in toto* to an overall deposit number.  However, the returns for 2001 and 2005 also include time outside the lookback period, and it seems virtually certain that some of the reported income for those years was deposited into the entireties' account outside the lookback period, and some during that period.  In the absence of further detail as to <u>when</u> deposits were made during those two years, the Court could handle the returns in a number of ways.  One would be to totally disregard any deposits for those years due to too much uncertainty.  This seems unduly restrictive in that it ignores the virtual certainty of deposits having been made during the lookback portions of the years in question.  Another possibility would be to take a strict *pro rata* approach and assume deposits were made proportionately throughout the year in question.  Under that approach, the Court would find

20

that 21.6%[12] of the Debtor's 2001 income was deposited into the entireties' account during the lookback period, while 78.4% of his 2005 income was so deposited. This seems overly generous to the Trustee, who after all does have the burden of proof and should feel the consequence of any uncertainty.

The Court finds that if it takes ½ of the strict *pro rata* amounts for the affected two years, that will give it sufficient confidence that the Trustee's burden has been met.[13] That would mean 10.8% of 2001 income, and 39.2% of 2005 income. To sum up, the Court therefore finds that the Trustee has sufficiently proven, that is by a preponderance of the evidence, that deposits totaling $933,472 were made into the Defendants' entireties' account at PNC Bank from the individual C&G compensation of the Debtor during the lookback period.

The C&G compensation is not the only possible item of deposits into the PNC entireties' account that is at issue here. The Debtor also acknowledged receiving an inheritance of $66,722.62 from the estate of his father, William Wettach, during the lookback period. Like his compensation from C&G, this would have been individual property of the Debtor, and the Trustee seeks to recover it "to the extent that those amounts were deposited in the joint PNC checking account and drawn from that account for purposes other than necessities." *Trustee Post Trial Brief* at 11.

---

[12]    As the Court calculates it, 79 days in 2001 were within the lookback period, while 287 days in 2005 were within the lookback period. This equates to the respective percentages shown for each of the years.

[13]    It may be argued that such calculations are arbitrary. Other than either completely disregarding the years 2001 and 2005, or using a strict pro rata approach, any other approach to resolution of the matter arguably could be considered somewhat arbitrary. However, in the end, since only $380,000 of the entireties account is found to be recoverable, the amount of deposits found into the account does not really impact the final decision so long as the amount is above the $380,000 level.

21

The record discloses some uncertainty as to what was done with the money from this inheritance. The Trustee, relying upon Exhibit 24 and the accompanying "source documents" from which the compilation was made, asserts that a net of $66,722.62 from the inheritance went into the PNC entireties' account. The Exhibit shows deposits made on May 8, 2002, July 8, 2002, and August 12, 2002 and the source documents, pages from the defendants' Q Book,[14] do indeed seem to confirm such deposits were made. However, the Debtor also gave undisputed testimony that during the 2002-2003 time frame, money was also put into the Defendants' Merrill Lynch Investment Account, and the source of funds for that was the inheritance he received from the estate of his father. *Tr. Tran.* at 51, lines 6-15.

Attempting to reconcile these seemingly contradictory assertions, the Court is led to conclude that the most likely explanation is that the inheritance funds were originally deposited into the PNC entireties' account, and then subsequently withdrawn from that account and deposited into the Merrill Lynch Investment Account. Assuming that to be what happened, the Court concludes that the Trustee cannot make a recovery as to these funds because he has voluntarily waived any recovery related to deposits into or withdrawals from the Merril Lynch Investment Account.[15] Thus, the Trustee has proven potentially actionable deposits of $933,472 into the PNC entireties' account during the lookback period, and that serves as the starting point for further analysis by the Court.

---

[14]    The Q books are checking records for the PNC entireties' account which the Defendants maintained through use of the Quicken computer program, and which they turned over to the Trustee in discovery.

[15]    The Court was left with the task of weighing the relevance of this evidence since the Trustee merely relied on the exhibit to speak for itself. In trying to square the exhibit with the Debtor's testimony, the Court was required to "connect the dots" as to the exhibit's purpose. The Defendants did not object to the evidence nor did the Trustee explain its relevance.

The Trustee must next show that the transferred funds were spent on non-necessities, or were used to acquire other entireties' property still being held as such. It must also be kept in mind that the Defendants had the burden of producing at least some useful evidence to demonstrate how they spent the transferred funds.

### B. (1)    The PNC Entireties' Account

The Trustee has identified six broad groupings of expenditures from the PNC entireties' account that he contends do not qualify as necessities, making them recoverable under *PaUFTA*. Each of these groupings is discussed below.

### B. (1)(a)    Miscellaneous Investments

In this category the Trustee identifies expenditures of $82,500 from the entireties' account that were used for what he terms miscellaneous investments. These are itemized in Exhibit 31, which shows a single payment of $2,500 to an entity known as Evoxis, Inc., and three payments totaling $80,000 to an entity known as Speed 4 U, LP. The Debtor testified that he owned a 1% interest in Evoxis and that the payment in question represented a voluntary investment by him. *Tr. Tran.* at 80, l. 14, *et. seq*. The Debtor also had an equity interest in Speed 4 U, and the payments to it were also voluntary investments. *See id.* at 81, line 11, *et. seq*.

The Court agrees with the Trustee that these payments do not qualify as necessities for purposes of a fraudulent transfer analysis. However, one of the payments in question, $50,000

23

to Speed 4 U on December 3, 2003, was made not from the PNC entireties' account, but rather from a Merrill Lynch investment account which the Defendants jointly owned. *See, Exhibit* 31, p. 4; *Tr. Tran.* at 82, ll. 8-21.   As the Court has previously noted, in his post-trial brief the Trustee has voluntarily discontinued any effort to make recoveries related to deposits or withdrawals from the Merrill Lynch account. *See*, fn 7, *supra*.   Since this particular payment came from the Merrill lynch account it may not be recovered.   Under this category, the Trustee has thus proven by a preponderance of the evidence, $32,500 in non-necessity investment expenditures from the PNC entireties account.

### B. (1)(b)    Entertainment/Travel

The expenditures in the category of entertainment and travel total $75,476.22 and are itemized in Exhibit 34.  Counsel for the Trustee stated that this list was compiled by going through the Defendants "Q books" and two credit card billing records, and pulling from them any expenditures that appeared to be travel or entertainment related, for instance air fare, hotels, and dining.  The Debtor was asked at trial if he was able to determine if any of the charges in the exhibit were business related.  He testified that he was "pretty sure" that "probably 85 per cent" of the charges were business related. *Tr. Tran.* at 105, lines 7-14, 22-24.  However, he was unable to say whether any specific line  item expenditure was or was not business related.  The Debtor also testified that of the total amount shown on the exhibit, approximately $27,000 had been reimbursed by clients. *Id.* at 106, lines 2-5.  When asked how he had arrived at that figure, the Debtor stated it had been based on his personal  review of the "source documents." *Id.* at 107, lines 12-16.  The Debtor further testified that the difference of approximately $48,000 between the total expenses

24

shown on Exhibit 34 and what he had been reimbursed by clients was not necessarily non-business related because many of his client expenses were not reimbursed.

Counsel for the Trustee attempted to go through individual items in the list with the Debtor to determine which were business related, but the Debtor said he could not do so because he needed "different documents" than the ones in the Exhibit.  When asked what other documents he was referring to, the Debtor said he had source documents that came off the Q Books that showed what he paid.  The following exchange then occurred:

> Q.    All right.  So I'm going to presume that while you and Mr. Cooney
>       reviewed this documentation, that you're going to produce
>       evidence that you've just referred to relating to the fact that some
>       of these were business related, and some of those business related
>       expenses were reimbursed.
> A     That's correct.

*Tr. Tran.* at 108, lines 11-16.  The Debtor also testified that he had documents with descriptions of the entries that were not contained in the source documents that had been used to prepare Exhibit 34 and that he (Debtor) would be introducing those documents later.  *Id.* at 109, lines 1-7.

The subject of these entertainment/travel expenses never again came up at trial, and in particular, the additional documents which the Debtor had indicated would be introduced to explain the expenses, were not forthcoming.  As was discussed above, even though the Trustee has the overall burden of proof, the Defendants have the burden of providing at least some useful evidence to show what transferred funds were spent on, and if they failed to do so the Trustee will be presumed to have met his burden.

The *Cohen* decision provides the Court guidance as to how this burden of production should be implemented. In that case, the trustee had sought reimbursement for various expenses he claimed were not necessities, including some "unexplained" expenditures. Addressing this aspect of the case, Judge Deller stated:

> During trial, the Trustee asked the Debtor whether he could tell the Court what these funds were used to purchase. The Trustee specifically asked the Debtor, "[i]f I were to ask you to review these nine pages to determine the purpose for which the checks here have been drawn, do you have access this afternoon to information that would enable you to answer that question?" The Debtor responded that he believed the statements were accurate, but could not answer what was purchased with said funds .... This Court therefore finds that the Defendants failed to satisfy their initial burden of producing some evidence regarding what they purchased with the deposited funds....

*Cohen* (B. Ct.), 2012 WL 5360956  Opinion at * 13. On appeal, the district court stated that  Mr. Cohen had testified that he did not know what the funds in question were specifically used for, but that they were used for necessities. In affirming on this point, the district court held that the bankruptcy court had not committed clear error by affording no weight to this testimony. *Cohen* (D. Ct.), 2013 WL 772705 at * 5.

In the present case, the Defendants at least provided the Trustee with sufficient evidence to show that the expenditures at issue were related to travel. They did not, however, provide evidence – evidence that they acknowledged having in their possession – that would have gone a step further and showed whether particular items of expense were business-related (and therefore likely necessities), or not business-related (and therefore likely non-necessities). The Debtor did testify that he had personally reviewed documentation showing that approximately $27,000 of the expenses in question had been reimbursed by clients, making them clearly business-

26

related.  This has the ring of truth and the Court will accept it as a fact.  As to the remainder of this category, however, the Court finds the Debtor's bare assertion that overall probably 85% of the expenses were business-related, to be entitled to no weight, particularly when the Debtor made clear that evidence which could have proven this assertion was readily at hand.  Under the circumstances presented,  the Court  finds that the Defendants failed to meet their burden of production with respect to $48,476.22 of the expenses in this category, and the Trustee will be deemed to have met his burden of proof in this category to that extent.

### B. (1)(c)    *Auto Expenses*

In this category, the Trustee is seeking a recovery of $134,706.02 for automobile expenses incurred by the Debtors during the lookback period.  Clearly, in this day and locality it would be agreed by virtually everyone that some reasonable level of motor vehicle expense would qualify as a necessity for the typical family.  *See, e.g., Cohen* (B. Ct.) 2012 WL 5360956 at * 13. The  Trustee does not dispute that general principle, but he argues that the Defendants expended "exorbitant amounts" on "high-end" motor vehicles during the lookback period which should not be considered as expenditures for necessities.

The evidence adduced at trial showed that the Defendants owned seven (7) motor vehicles at the time of the bankruptcy filing, this in a household of two people.  The Debtor valued them at $12,000 each in his petition, explaining that he had not given the values to his bankruptcy attorney and was not sure why they were valued that way, but that $12,000 "looked like a good average." *Tr. Tran.* at 87, lines 4-19.  These vehicles consisted of 5 BMWs, a Ford F-150 truck, and

27

a Fiat Spider.  All of the vehicles were inspected (except for the Fiat, which was an antique that did not require inspection), operable, and insured.

The items of automobile-related expense were set forth on Exhibit 36 and included such things as insurance, repairs, parts, car payments, and automobile club payments.  The Trustee is not seeking recovery of any expenses for fuel or parking.

The Court agrees with the Trustee that not all of these expenditures by the Defendants can be justified as necessities.  Having said that, the Trustee presented little evidence as to exactly where the line should be drawn between vehicle expenses that were necessities and those that were not.  The Court concludes that reasonable arguments can be made for considering two or three vehicles to have been necessities for the Defendants.  The argument for two vehicles would obviously be an allowance of one vehicle for each member of this two-member household.  The argument for three vehicles would be to allow one more vehicle for specialized uses, such as hauling, property maintenance, etc., that would be beyond the capacity of a regular passenger car.  Based on the record before it, the Court finds that the size and character of the Defendants' property is such that an additional service vehicle would be warranted.  The Trustee thus failed to meet his burden of showing a third vehicle, specifically the Ford F-150 pick up truck,  would not be a necessity.  Therefore, the Court finds that expenses allocated for and paid by the Defendants for three vehicles, 2 passenger cars and one utility vehicle, were payments for necessities.

Having determined that ownership expenses for only three vehicles may be justified as necessities, the Court is next left to determine how that affects the amount claimed by the Trustee. The listed expenses were not broken down by vehicle, or at least not to the point where the Court

28

could attribute particular expenses to a particular vehicle.  And in any event, even if the expenses

could be so apportioned, there is no basis for deciding which of the vehicles should be considered

necessities and which luxuries.  The Court does note that, regardless of his testimony attempting to

distance himself from the filing, the Debtor himself filed a petition that placed an equal value on

each of the vehicles.  The Court thus feels a sufficient level of comfort to treat all of the vehicles as

equivalent, and thus to allocate the expenses among the vehicles on a strictly proportionate basis.

In other words, since 4/7ths of the motor vehicles were not necessities, the Trustee may recover

4/7ths of the expenses in this category, or $76,975.[16]


### B. (1)(d)    Housing


In this category, the Trustee is seeking $178,508.21, itemized on Exhibit 38,  related

to improvements made by the Defendants to their home  that he contends were not necessary.  The

house in question, is located at 152 Kenyon Rd., Pittsburgh, Pa.  Vacant land was purchased by the

Defendants in 1994 and the house was built shortly thereafter, with the Defendants actually moving

in during 1996.  Since 1997 or 1998 the Defendants have been the only residents at the house, their

adult daughters having both moved out by then.


The Debtor testified that the house was habitable when they moved into it, but that

it was not "finished."  Prior to 2002 the house had a living room, dining room, kitchen, den, four

---

[16]        As a very rough check on that conclusion, the Court takes judicial notice  that the current IRS national
standard for monthly motor vehicle ownership costs, effective April 2, 2012,  is $517 per car.  Taking that figure times
three, times the 48 months of the lookback period, would yield necessary expenses totaling $74,448, which is within
reasonable distance of the Court's conclusion that $57,731 in vehicle expenses were necessities.  Given that monthly
ownership costs have undoubtedly risen over the last decade, the national standard would have been  lower during the
relevant period, bringing a result even closer to the Court's finding.

bedrooms, three bathrooms, and a garage. Beginning in 2002, the Defendants had extensive

improvements made to the house. They finished the basement, making an art studio for Mrs.

Wettach, an office for the Debtor, and adding a fourth bathroom. On the outside of the house they

had another garage, deck and stairways built, as well as landscaping which included a pond and

waterfall.

Under questioning by his attorney, the Debtor testified as follows:

> Q.    And you testified rather extensively regarding those [housing
> expenses]. Do you believe that completion of your house
> constituted a luxury item?
> A.    No.
> Q.    Can you tell me why not?
> A.    Well, the house had to be finished. I mean it wasn't in a saleable
> state at that point, if I wanted to sell it, I had to do something with
> it, and that's what we did. We finished the house, and put a garage
> on it, and finished the landscaping in the back of the house.

*Tr. Tran.* at 129, line 23 through 130, line 7. However, upon further questioning by the Trustee, the

Debtor acknowledged that there had already been a garage at the house prior to 2002, and that the

construction in question was for an additional garage. *Id.* at 144, line 6-17. He also stated that all

of the different improvements had been completed by 2004, but he has in fact never listed the house

for sale. *Id.* at 144, line 18 through 145, line 4.

As with automobile expenses, the Court certainly agrees that some level of housing

expense qualifies as a necessity for purposes of a *PaUFTA* claim. The Court would note that the

Trustee is not seeking to recover expenses related to mortgage payment, taxes, or utilities for the

Defendant's house, nor is it likely he could successfully do so. The challenged expenses related to

the 2002 through 2004 improvements are of another character, however. The undisputed evidence

30

showed that the Defendants' house was habitable prior to the commencement of the improvements, and in fact they had been living there for 6 years with no apparent problems.  The evidence also showed that the pre-improvement version of the house was already more than adequate for a two-person household, having four bedrooms and three bathrooms.

The Court certainly does not fault the Defendants for wanting to add additional amenities to the house, but does not see how by any reasonable stretch these amenities can be considered necessities.  There was no testimony that the art studio or office were needed for the Defendants' to be able to engage in financially remunerative activity, nor was the need for an additional garage explained.[17]  New water landscaping features likewise cannot be viewed as necessities under any circumstance.  As to a deck, the Court can envision circumstances in which it might qualify as a necessity, for example if a house was built with a raised doorway that cannot be used until an adjoining deck is constructed, but there was nothing to indicate that was the case here.

Not all of the expenditures listed on Exhibit 38, however, appear to relate to these non-necessary improvements.  The Debtor was able to identify some particular items that were likely for home repairs,  maintenance or other things that the Court would view as necessities.  The following expenses are found to fall into that group:

| | | | |
|---|---|---|---|
| • | Press Brothers | $  804.65 | repair |
| • | Titan VAC. | $  525.00 | repair |
| • | Pool City | $1,213.38 | furniture |
| • | Chuck McPherson | $3,506.00 | unrelated work in house |

---

[17]    The Court has previously found that any automobile expenses for more than three vehicles were not necessities, which would comport with a finding that an additional garage was likewise not necessary.

| | | | |
|---|---|---|---|
| • | CRMdesigns | $  680.00 | unrelated work in house |
| • | Decsign Co., Inc. | $1,203.84 | unrelated work in house |
| • | Robert Murphy | $1,014.00 | yard work |
| • | Boom Plumbing | $  763.78 | furnace upgrade/repair |
| • | Urban Tree care | $1,500.00 | tree trimming |

These expenses, totaling $11,210.65 must be deducted from what Trustee is seeking, resulting in a finding that the Trustee met his burden in this regard and may recover $167,297.65 under this category for unnecessary home improvement expenses.

### B. (1)(e)    Contributions

Under this category the Trustee seeks recovery of $27,595.62, reflecting charitable contributions that the Defendants made during the lookback period.  The Trustee concedes that this is not an "outlandish" amount, but says the contributions were voluntarily made and should be recoverable.  The individual contributions under this category are listed on Exhibit 39, and with a few exceptions all appear to be to well-recognized charitable entities, such as schools, United Way, theater, symphony , public television and a church. The largest such individual donation was $1,690.62, and almost all were for $1,000 or less.

The Bankruptcy Code recognizes charitable contributions as a legitimate, and indeed encouraged, expense for debtors.  *See, e.g. 11 U.S.C. §544(b)(2)* (excluding trustee's lien creditor status with respect to charitable contributions); *11 U.S.C. §548(a)(2)* (excluding transfers to a charitable entity from reach of fraudulent transfer provision); *In re Goforth, Inc.*, 466 B.R. 328, 336 (Bankr. W.D. Pa. 2012) (discussing the *Religious Liberty and Charitable Donations Protection Act* of 1998, Pub. L. 105-183 (June 19, 1998)).  The amount donated by the Defendants here does not

strike the Court as in any way unreasonable.  Given that the Court has previously found that the

Debtor earned income of at least $933,000 during the lookback period, the total of challenged

contributions represents only about 3% of income.

As noted above, however, there are a few items in the list which cannot be viewed

as reasonably necessary charitable expenses, those being donations that were made to the C&G

PAC, the National Republican Congressional Committee, and the Jan Esterly campaign.  Such

contributions, totaling $2,200, were political in nature, and since the Trustee has met his burden in

this regard, this amount may be recovered by him.


## B. (1)(f)    *Allowance*


The Trustee characterizes this category as comprising a portion of the "allowance"

for some ordinary household expenses that was transferred from the PNC entireties' account to Mrs.

Wettach during the lookback period.  According to the evidence, Mrs. Wettach would take these

allowance payments, deposit them into another  account at Dollar Bank (also held jointly with the

Debtor), and then make various payments out of that account.  Among the items for which payments

were made with the allowance were food, all utilities, clothing, and "everything else" in the nature

of household expenses other than mortgage, car payments, and insurance (which were paid from the

PNC entireties' account).  *Tr. Tran*. at 111, line 3 through 112, line 10.  The Trustee says the

existence of this Dollar Bank account was not disclosed on the Debtor's petition and he (the Trustee)

only learned about it shortly before trial.  The total amount of these allowance payments made

during the lookback period was $148,505.  Of that amount, the Trustee is seeking a recovery of

$54,755.

The Trustee arrived at the above figure in the following manner.  First he took the

Debtor's normal monthly expenses as shown on Exhibit J to the petition, and from that he deducted

the expenses known to be paid from another source, i.e. the mortgage payments, auto payments,

insurance, and home maintenance that were paid from the PNC bank entireties' account.  He thus

arrived at total monthly expenses of $1,950 that would have been paid from the funds represented

by the allowance.  Taking that amount over the life of the lookback period leads to total expenses

of $91,650,[18] and he thus concludes that the amount provided by way of the allowance exceeded

reasonable and necessary household expenses by $54,755 during the lookback period.

The Trustee questioned Mrs. Wettach about the various expenses that were paid out

of the allowance, via the Dollar Bank account, and she confirmed that the items from Schedule J that

the Trustee has used to arrive at his figure were, in fact the items that were paid from the allowance.

*See Tr. Tran*. at 164, line 6 through 169, line 13.  Mrs. Wettach also confirmed that she helped her

husband prepare Schedule J.

The Trustee's theory is that the Defendants should be bound by the monthly expense

listed in Schedule J, and that to the extent the total of those expenses over the lookback period are

less than the amount paid in allowances, such represents unexplained expenditures that should be

amenable to recovery.  The Court agrees with the Trustee.  While the Defendants have provided

evidence to the satisfaction of the Trustee to show monthly necessary expenses of $1,950 payable

with the allowance, in the form of their Schedule J, which the Trustee does not contest, they have

---

[18]    For some unexplained reason, the Trustee "extrapolated" this monthly figure over only 47 months, rather than the 48 the Court would have expected.  The Court has adjusted the amount sought by the Trustee downward by $1,950 to account for that additional month.

34

not provided any evidence to show what the remaining amounts of the allowance were used for.

Thus, the Defendants have not met their burden of production as to that portion of the allowance

claim and the Court will deem that these funds were not spent on necessities.  The Trustee may thus

recover $52,805 under this category.

### B. (1)(g)    Summary as to PNC Entireties' Account

To sum up, regarding the PNC entireties' account, the Court finds that the Trustee

has met his burden under *PaUFTA* to show expenditures for non-necessities in the following

amounts:

| | | |
|---|---|---|
| 1. | Miscellaneous Investments | $ 32,500.00 |
| 2. | Entertainment/Travel | 48,476.22 |
| 3. | Auto Expenses | 76,975.00 |
| 4. | Housing | 167,297.65 |
| 5. | Contributions | 2,200.00 |
| 6. | Allowance | 52,805.00 |
| | TOTAL | $380,253.87 |

This amount is well within the amount of deposits proven to have occurred.  The Court has also

previously found that the Debtor was insolvent for purposes of *PaUFTA* at all times when the

deposits were made.   Finally, the evidence was clear that, other than the Debtor's C&G

compensation,  there was no source of "other deposits" into the entireties account during the

lookback period.  *See, e.g.*, *Tr. Tran*. at 162, lines 10-12 (Mrs. Wettach testifying that she had no

income which she deposited into the entireties' account since 2001).  To be more exact, there was

another source of funds into the entireties' account during the relevant period, that being the

inheritance from the Debtor's father, but it was subsequently paid into the Merrill, Lynch account

and, as previously explained, has been waived so it is appropriately disregarded.  The Defendants also argued at one point that Mrs. Wettach had made a deposit of an inheritance that she received into the account, but under questioning she conceded that would have occurred long before the lookback period.  *See Tr. Tran.* at 161, line 23 through 162, line 2.  Furthermore, any suggestion that intangible, non-economic contributions by Mrs. Wettach can be treated as another "deposit," or somehow otherwise provide reasonably equivalent value, must be rejected.  *See Cohen* (D. Ct.), 2013 WL 772705 at * 7.

The Trustee has thus proven by a preponderance of evidence that all necessary elements for a constructive fraudulent transfer claim under *12 Pa.C.S.A. §5105* related to the entireties' account exist.  Among other things, he has shown that the transfers were made without the Debtor receiving a reasonably equivalent value at a time when he was insolvent.  Additionally, the Defendants are entitled to no offset for any "other deposits" made into the entireties account. The Court has also previously concluded that the Debtor believed, or reasonably should have believed, that he would be unable to pay his debts as they came due, so the Trustee also proved his case under *12 Pa. C.S.A. §5104(a)(2)(ii)*.  Since the initial fraudulent transfers were made to the Defendants as tenants by the entireties, the Trustee may recover from either or both of the Defendants.

The Court does note that the Amended Complaint seeks "interest," which is presumably a reference to pre-judgment interest on any amount found due on the *PaUFTA* claims. The Trustee has never pursued that remedy any further in this action, nor does it appear that was done by any of the trustees in the other Titus cases.  The Court therefore presumes the Trustee has

36

waived any claim for prejudgment interest, although the accompanying order will set a deadline for filing any motion seeking prejudgment interest just to be certain.

### B. (2)    *Balance Remaining in Bank Accounts at Time of Bankruptcy Filing*

The Trustee is here seeking a recovery of $49,837.67, representing the balance in three jointly held bank accounts at the time of the filing of the petition:

- Dollar Bank (#xxxxxxxx5805)                    $ 10,573.32
- Dollar Bank (#xxxxxx4309) (savings)        $  4,178.20
- Dollar Bank (#xxxxxx4309) (checking)      $     602.68
- PNC Bank (#xxxxxx6039)                          $ 34,483.37

*See* Exhibit 41.  It will be noted that one of those accounts is the PNC entireties' account, so to that extent this item could have been addressed in the prior section of the *Opinion*.  However, since the Trustee has lumped the four accounts together, the Court finds it more convenient to follow that lead and deal with them collectively here rather than split them up.

Much like the discussion given above related solely to the PNC entireties account, the Trustee's theory here is that the exclusive and ultimate source of funds for the four accounts was the Debtor's individual compensation, and since there were  balances in the accounts at the time  the bankruptcy petition was filed,  it naturally follows that the balances in the account were  not  spent on necessities and are therefore recoverable.

The Trustee also notes that the Defendants have not shown that the balances were ever used for the payment of necessities, implying that perhaps if the balances were used to fund

37

necessities after the filing that could somehow reduce or eliminate the Trustee's claim.  The Court

does not necessarily agree with that position.  It has previously been determined that the applicable

lookback period is October 14, 2001 through October 14, 2005.  In the Court's view, the relevant

"snapshot" of the status of the accounts is at the end point of that lookback period, so whatever

happened to the balances after that date would be irrelevant.  In any event, there is no indication that

funds in the accounts at the time of the filing were subsequently used for necessities, so the Court

need not decide that issue.

The Defendants stipulated that the balance amounts in the accounts was correct.  *See
Tr. Tran*. at 48, lines 16-18.  The Debtor did not disclose the existence of the Dollar Bank accounts

in his petition, nor did he claim an exemption in them.  He did disclose the PNC entireties' account,

although he showed it with a balance of $22,000.  The debtor claimed an exemption in the PNC

entireties' account on the basis that it was entireties' property owned with his wife.

The Court finds the Trustee's basic argument sound.  It has previously been

established that if the Debtor's individual compensation was transferred into a joint account, that

constitutes a fraudulent transfer, except to the extent such funds were subsequently used to pay for

necessities for the marital unit.  As indicated above, the Court believes it must look to the status quo

in the accounts as it existed on the date of the bankruptcy filing.  At that point in time, there were

balances in the accounts so those funds clearly had not been spent on necessities.  The fact that the

Defendants may have planned in the future to spend the balances in whole or in part on necessities

invites improper speculation and is of no moment.

38

The Trustee may thus recover the balances in the PNC entireties' account and in the one Dollar Bank account with both a checking and savings component (#xxxxxx4309), i.e., the one into which Mrs. Wettach deposited the funds she received as an allowance for household expenses. As to those accounts, the evidence was clear that the exclusive source of funding was the Debtor's individual compensation.  The other Dollar Bank account (#xxxxxxxx5805) is a different matter. The Court has reviewed the trial transcript and can find no evidence to show the source of funds for that account.  *See, e.g.*, *Tr. Tran.* at 115, line 12 through 116, line 4.  The Trustee failed to meet his burden of proof with respect to that account.

To sum up, under this category the Trustee may recover $39,264.25.  The Debtor may not thwart the Trustee's fraudulent transfer recovery by claiming an exemption in the PNC entireties account, so to the extent necessary, the *Objections* to exemption will be granted.  *See, e.g.*, *In re Duncan*, 329 F.3d 1195 (10th Cir. 2003) (Chapter 7 trustee, who had avoided as a fraudulent transfer the debtor-husband's pre-petition transfer of property that he owned to he and his wife as tenants by the entirety, could recover even though debtor had claimed a homestead exemption in the property and the trustee had never objected to exemption); *11 U.S.C. §522(g)(1)* (limiting debtor's ability to exempt property recovered by the trustee to transfers that were not voluntary transfers).

### B. (3)    *Guardian Life – Increase in Cash Value*

The Debtor has valued his interest in a Guardian life insurance policy at $135,000,

39

and claimed that as exempt pursuant to a Pennsylvania statute, *42 Pa. C.S.A. §8124(c)*.[19]  The

Trustee explains his challenge to the Guardian Life policy as follows:

> The Trustee does not challenge the Guardian Life policies, does not
> challenge the death benefits, does not even challenge the cash value of the
> Guardian Life policies.  The trustee seeks to avoid as fraudulent transfers
> only those premium payments and dividend reinvestments which resulted
> in an increased value of the Guardian Life policies subsequent to October
> 14, 2001....The Trustee advances the same argument [as expressed by the
> Court in *Matter of Loomer*, 222 B.R. 618 (Bankr. D. Neb. 1998) ] as to the
> Guardian Life premium payments and dividends reinvested after October
> 14, 2001 to the extent that an increase in the cash value was realized.  the
> death benefit of the policies did not change.  The cash value, an amount
> beyond the reach of the Debtor's creditors, did change.  That increase in the
> cash value of the Guardian Life policies resulted from a fraudulent transfer
> of Debtor's assets and is therefore avoidable.

Trustee Post trial brief at 7-8.

The Debtor testified that he owned the Guardian Life policy individually, that it was

purchased well before the lookback period, and that the $135,000 figure he listed for a value

---

[19]    That statute provides in relevant part:

> (c)    Insurance proceeds.--The following property or other rights of the
> judgment debtor shall be exempt from attachment or execution on
> a judgment:
> ...
> (3)  Any policy or contract of insurance or annuity issued to a solvent insured who
> is the beneficiary thereof, except any part thereof exceeding an income or return of
> $100 per month.
>
> (4)  Any amount of proceeds retained by the insurer at maturity or otherwise under
> the terms of an annuity or policy of life insurance if the policy or a supplemental
> agreement provides that such proceeds and the income therefrom shall not be
> assignable.
> ...
> (6)  The net amount payable under any annuity contract or policy of life insurance
> made for the benefit of or assigned to the spouse, children or dependent relative of
> the insured, whether or not the right to change the named beneficiary is reserved by
> or permitted to the insured. The preceding sentence shall not be applicable to the
> extent the judgment debtor is such spouse, child or other relative.

probably represented the cash value of the policy. *Tr. Tran.* at 40, line 18 through 41, line 5. He

further testified that the term "cash value" did not mean he could just go to the insurance company

and obtain that amount. Payment would be in the form of a loan that he would have to pay back at

8% interest. *Id.* at 130, lines 14-20.

The Trustee has set forth his computations regarding the Guardian Life policy on

Exhibit 25. The Defendants have stipulated to the accuracy of the numbers stated in that exhibit,

while disagreeing with the legal conclusions the Trustee seeks to have the Court draw. In reviewing

the Exhibit, the Court is immediately struck by the fact that 6 of the 8 Premium/Dividends Accrued

entries occurred outside the lookback period, from 2006 through 2011. These cannot be recovered

pursuant to the Wettach FTA, nor can they be the subject of an *Objection* to exemption as they were

post-petition transactions. Eliminating those excluded transactions immediately reduces the

Trustee's claim for this item to $39,371.84, the amount of the "increase in cash value" that occurred

during the lookback period.

Even as to this remaining amount, the Court finds that the Trustee cannot make a

recovery. In the first place, it appears the Guardian Life policy, including its cash surrender value,

is exempt under *42 Pa.C.S.A. §8124(c)(6)*. Second, even if it were not exempt, the Trustee has not

set forth a viable argument as to why he should be able to make a recovery. When faced with a

similar claim by the trustee in the *Cohen* case, the bankruptcy court properly stated:

> This Court holds that the purchase of life insurance policies to
> benefit a spouse, or the payment of premiums required to maintain
> the policies in effect, constitutes an expense reasonable and necessary for the
> maintenance of the Defendants' household. This Court thus finds that the
> Debtor received reasonably equivalent value in return for any of the direct
> deposits of his salary that he may have used to fund such premiums.

41

2012 WL 5360956 at *12.  *See also*, *Arbogast*, 466 B.R. at 319-20.   The Court agrees with that

conclusion.  Even assuming that the premium payment amounts in question ($19,286.28 in both

2004 and 2005) came from the Debtor's individual compensation, which is frankly not entirely clear

from the record, the Court finds that the payments were not unreasonable and were payments for

necessities.


### B. (4)    C&G Severance Benefit

As of the date his petition was filed, the Debtor had an employment agreement with

C&G dated January 1, 2000, that provided he would receive a formula-based severance benefit from

the firm in the event of his termination from employment.  The Debtor became a "contract"

employee of C&G in November 2009, triggering the right to receive the severance pay.  On January

7, 2011, he was paid $16,830.28 by C&G, the net amount of the severance benefit after deduction

of taxes.

The Trustee says he is seeking to recover this amount for the estate on a "very basic

theory."  He says the severance benefit was a right to receive money which the Debtor enjoyed as

of the date his petition was filed, but since it was neither scheduled or exempted in the petition, it

is an asset the Trustee may recover.

An initial question is presented as to whether the Trustee's claim of the severance

benefit falls within the scope of either the Wettach FTA or the *Objections* to exemptions.  The latter

is obviously an impossibility since the severance benefit was not listed in the petition, nor was an

42

exemption claimed in it.  As to the former, the Trustee is not claiming that the severance benefit

constituted a fraudulent transfer in any way, and a review of the *Amended Complaint* reveals nothing

that might reasonably be characterized as an effort by the Trustee to recover the severance benefit

payment.  Rather, what appears to have happened in the Court's view, is that the Trustee became

aware of the severance benefit during discovery and added it to his platter of claims at trial, without

taking any steps to amend the pleadings first.

Given this, the Defendants would certainly have had grounds to object at trial on the

basis of unfair surprise, or raising issues beyond the pleadings, when the Trustee brought up the

severance benefit issue.  However, after  having reviewed the trial record, the Court does not find

that the Defendants ever made any such objection.  Thus, the Court finds that the following *Rule* is

implicated here:

> **(b) Amendments During and After Trial**.
> ...
>
> (2) For Issues Tried by Consent. When an issue not raised by the pleadings
> is tried by the parties' express or implied consent, it must be treated in all
> respects as if raised in the pleadings. A party may move--at any time, even
> after judgment--to amend the pleadings to conform them to the evidence
> and to raise an unpleaded issue. But failure to amend does not affect the
> result of the trial of that issue.

*Fed.R.Bankr.P. 7015*, incorporating *Fed.R.Civ.P. 15(b)(2)*.  Since the Defendants never objected at

trial, the issue relating to the severance benefit was tried by consent, and the Court will proceed to

consider it.

The legal issue presented is whether an interest that was only conditional or

contingent at the time the Debtor's petition was filed, and only paid to Debtor subsequently after the

condition was fulfilled, constitutes property of the estate that the Trustee may recover.  The Parties

have not pointed to any law on this question, but the Court's own research has revealed some

pertinent cases.  For instance, in *In re Booth*, 260 B.R. 281 (6th Cir. BAP 2001) the trustee filed a

turnover action against the debtor, seeking to recover a *pro rata* portion of a postpetition profit

sharing payment that the debtor had received from his employer.  The debtor argued that because

he had filed his petition before the employer calculated its profits or made the payment, he had no

legal or equitable interest in the profit sharing when the petition was filed and therefore no part of

the payment was property of the estate.  The court began by noting that the purpose of  *11 U.S.C.*

*§541(a)(1)* is to bring anything of value that the debtor has into the estate.  It found the debtor's

interest in his employer's profit sharing to be a contingent interest under Ohio law, and further found

that contingent interests were fully alienable and attachable by creditors.  The Court stated that in

applying the Bankruptcy Code, courts have "almost uniformly adhered to the view that contingent

interests are property of the estate under *§541(a)(1)*."  260 B.R. at 285.

The *Booth* court cited a long list of cases to that effect, involving a variety of different

types of contingent interests, including a severance benefit.  *See, e.g., In re Ryerson*, 739 F.2d 1423

(9th Cir. 1984) (payments made to debtor after termination from employment based on pre-petition

contract were property of the bankruptcy estate, although paid after commencement of the case, at

least to extent payments were related to pre-bankruptcy services).  *See also*, *In re LaSpina*, 304 B.R.

814 (Bankr. S.D. Ohio 2004) (where debtor had negotiated a severance benefit with his employer

pre-petition, the payment was property of the estate even though not made until post-petition; in

such cases focus is on whether the payments are sufficiently rooted in the pre-bankruptcy past so

as to be included in the estate).  By contrast, *see, In re Moseman*, 436 B.R. 398 (Bankr. E.D. Tex.

2010) (severance payment was not property of the estate where it was made post-petition, and debtor

44

did not have a contingent right to a severance payment under a pre-petition employment contract);
*In re Bruneau*, 148 B.R. 4 (Bankr. D. Conn. 1992) (post-petition severance payment not property
of the estate where debtor had not elected to participate in severance program until after petition
filed).

In the present case, the Debtor clearly had a contractual right to the severance
payment at the time his petition was filed, and such right was clearly rooted, in part, on his pre-
petition services to C&G under that contract.  The Court has reviewed the employment contract and
finds nothing therein to indicate that the severance payment was intended to be non-alienable, or
otherwise protected under the *Employee Retirement Income Security Act* or some similar statute, nor
has the Debtor argued that the benefit is protected on that basis.  The Court must therefore conclude
that the severance benefit was property of the estate pursuant to *11 U.S.C. §541(a)(1)*.

That is not the end of the matter, however, because the Court does not believe it
would be fair and equitable for the Trustee to be able to recover the entire amount of the severance
benefit.  This is not a situation where the trigger for entitlement to the benefit occurred only shortly
after the bankruptcy petition was filed.  That did not happen until November 12, 2009, more than
4 years after the petition was filed.  If the Debtor's entire body of service to C&G is viewed as the
consideration for the severance payment he eventually received, then it is clear a sizeable portion
of that service occurred post-petition.  *See, e.g.*, *11 U.S.C. §541(a)(6)* (property of the estate does
not include individual debtor's post-petition earnings).  As a matter of equity, the Court therefore
concludes that the Trustee may recover only that portion of the severance benefit payment
corresponding to the pre-petition period of the Debtor's service at C&G pursuant to the employment
agreement.

45

The employment agreement creating the severance benefit right was signed on January 1, 2000 and the Debtor's petition was filed on October 14, 2005. Thus, roughly 5/9 of the service underlying the severance benefit occurred pre-petition. Therefore, the Trustee may recover that proportion, or $9,350, as property of the estate.

### B. (5)    C&G Pension Contributions

The final item claimed by the Trustee is $204,503.28, representing contributions to the C&G, P.C. Pension Plan (the "C&G Plan") that were made during the lookback period on behalf of the Debtor, as well as gains realized from the contributions. The Debtor's interest in the C&G Plan is noted as "401K Pension Plan" on Schedule B of his petition and the total value is shown as $275,000. That entire amount is claimed as exempt by the Debtor on Schedule C pursuant to "42 Pa. C.S. Section 8124(b)." As noted previously, both Trizec and the Trustee filed *Objections* to the exemptions, which would include the exemption claimed in the C&G Plan.

The contributions/gains being pursued by the Trustee are itemized in Exhibit 30, which shows total of $155,000 in such contributions made from 2001 through 2005 and net gains of $49,503.28 realized from October 1, 2001 through 2005. The Defendants have stipulated to the accuracy of the numbers set forth in Exhibit 30, without agreeing that they are recoverable by the Trustee. *See Tr. Tran.* at 48, lines 10-11. The contributions were made directly by C&G into the C&G Plan for the benefit of the Debtor as part of his overall compensation.

The Trustee's theory as to these contributions is that they were similar to the deposit of the Debtor's earnings into the PNC entireties account in that they were made by C&G at the

46

voluntary direction of the Debtor, which had the effect of shielding the funds in question from creditors who would otherwise have been able to look to those funds to satisfy the debt owed to them by the Debtor.  The Trustee points out that the January 1, 2000 employment agreement that the Debtor entered into with C&G upon joining the firm provides that one of the "additional benefits" he was entitled to was participation in the firm's retirement benefit plan, "to the extent not waived by him."  *See* Exhibit 28.  The Trustee also points to Section 3.8 of the C&G Plan document which provides that an employee "may, subject to the approval of the Employer, elect voluntarily not to participate in the Plan."  *Id.*  The Trustee argues that, by not exercising his ability to opt out of participating in the C&G Plan, the Debtor engaged in fraudulent transfers.  The Court presumes the Trustee's theory to be that if the Debtor had opted out, the funds in question would have been paid to him as regular earnings which, assuming they had been deposited into the PNC entireties account along with the other earnings, could have been recovered as a fraudulent transfer.

As noted above, in Schedule C of his petition, the Debtor claimed an exemption in the C&G Plan pursuant to *42 Pa C.S. A. §8124(b)*.  This is actually a rather vague designation of a basis for claiming an exemption.  *Section 8124* is generally titled as "Exemptions of particular property," and consists of 3 subsections, one of which is *Section 8124(b)*, entitled "Retirement funds and accounts."  *Section 8124(b)* itself contains numerous, further subdivisions describing different types of such funds and accounts.  In their post-trial brief the Defendants have further specified the basis of the claimed exemption, pointing particularly to *42 Pa.C.S.A. 8124(b)(1)(vii)*, which provides:

> (b) Retirement funds and accounts.--
>      ...
>
>      (vii) Any pension or annuity, whether by way of a gratuity or otherwise, granted or paid by any private corporation or employer to a

> retired employee under a plan or contract which provides that the pension
> or annuity shall not be assignable.

*See* Doc. No. 115 at 13-14.  The Defendants note that, with certain exceptions not applicable here,

the C&G Plan  contains an anti-alienation provision that prohibits an assignment to creditors.  *See*

Ex. J at Section 9.2(a).  Also, despite the language in the January 1, 2000, employment agreement

between the Debtor and C&G, upon which the Trustee relies, the Debtor testified that he did not

believe he had the ability to opt out of participation in the C&G Plan.  *See Tr. Tran.* at 137, lines 10-

15; 149, lines 18-24.

In this case, the Parties have not pointed to any case law or other support interpreting

*Section 8124(b)(1)(vii)*, apparently each relying primarily on the plain language of the statute itself.

The Defendants are clearly correct that the C&G Plan appears to meet one of the conditions for an

exemption under the statute because it includes an anti-alienation provision.  However, there are a

number of exceptions in the provision which could arguably lead to a conclusion that the anti-

alienation condition is not met.   *See* Section 9.2(b)-(d) of the Plan.   Moreover, *Section*

*8124(b)(1)(vii)* also includes another condition, i.e., that the grant or payment by the employer is to

a "retired employee."   In this case, the Debtor was not a retired employee of C&G during the pre-

petition period.  By all indications he was functioning as an active, full-time employee at the firm

during the entire lookback period.  The earliest indication of any change in the Debtor's status that

might arguably be viewed as even a step toward retirement did not occur until November 2009 when

he became a "contract employee" of C&G, thereby triggering the severance benefit that was

discussed in the previous section of this Opinion.

48

The Court's cold, plain reading of *Section 8124(b)(1)(vii)* would thus seem to require a finding that the statute does not apply here.  Additionally, the Court's own research revealed the case of *In re Roberts*, 81 B.R. 354 (Bankr. W.D. Pa. 1987), wherein Judge Markovitz, when faced with a similar issue under the same statute, reached that same conclusion.  Rejecting an argument that the exemption should apply even though the debtor had not been retired when he filed his bankruptcy petition, Judge Markovitz stated:

> The Plaintiff asserts that this exemption applies only to "retired employees," and as Debtor was not retired as of the date of the bankruptcy filing, this statutory exemption is not applicable. Debtor counters that the alternate verbiage "granted or paid" refers to any employee having an entitlement to funds upon retirement. We are not guided by any legislative history in defining "granted" as it is used in this subsection. However, we do not believe that a lexicography or generic legal interpretation is appropriate. In reviewing the statute itself, we find that "granted" relates to "a retired employee". Similarly, there is a significant relationship between "granted" and "paid"; the existence of the disjunctive rules out mere redundancy. We believe that "granted" is a stage beyond vesting, while remaining a stage before payment. There has been no grant to a retired employee. There has been no payment to a retired employee. Indeed, there is no retired employee. Expressio unius est esclusio alterius. The exemption of the pension plan pursuant to 42 Pa.C.S.A. § 8124(b)(1)(vii) will be denied.

81 B.R. at 375-76.  In the absence of any contrary authority, the Court finds itself in agreement with the decision in *Roberts* and concludes that the funds being sought by the Trustee are not protected by *Section 8124(b)(1)(vii)*.

Although the Defendants have not made reference to any other specific subdivision under *Section 8124(b)* that might serve as a basis for an exemption, because they referenced the provision generally in Schedule C, the Court itself undertook a review to see if any might apply. The only other one that could potentially be a basis for exemption of the C&G Plan is *42 Pa. C.S.A.*

49

*§8124(b)(1)(ix)*, which provides:

> (ix)    Any retirement or annuity fund provided for under section 401(a), 403(a) and (b), 408, 408A, 409 or 530 of the Internal Revenue Code of 1986 (Public Law 99-514, 26 U.S.C. § 401(a), 403(a) and (b), 408, 408A, 409 or 530), the appreciation thereon, the income therefrom, the benefits or annuity payable thereunder and transfers and rollovers between such funds. This subparagraph shall not apply to:
>
>> (A)    Amounts contributed by the debtor to the retirement or annuity fund within one year before the debtor filed for bankruptcy. This shall not include amounts directly rolled over from other funds which are exempt from attachment under this subparagraph.
>>
>> (B)    Amounts contributed by the debtor to the retirement or annuity fund in excess of $15,000 within a one-year period. This shall not include amounts directly rolled over from other funds which are exempt from attachment under this subparagraph.
>>
>> (C)    Amounts deemed to be fraudulent conveyances.

It can be seen that a precondition for the application of an exemption under *Section 8124(b)(1)(ix)* is that the fund be "provided for under" certain provisions of the Internal Revenue Code ("IRC"). The exact meaning of this qualifying language is not entirely clear.

In the recent case of *State Farm Mut. Auto. Ins. Co. v. Lincow*, 792 F. Supp. 2d 806 (E.D. Pa. 2011), the court held that the term "provided for under" means the conditions set forth in the listed IRC sections must be met, or, using the parlance of federal tax law, the plan into which the funds in question have been paid must be "tax qualified." The Court agrees with the holding in *Lincow* and adopts it here. The *Lincow* court further held that the party asserting the exemption under *Section 8124(b)(1)(ix)* bears the burden of demonstrating such tax qualification. 792 F. Supp. 2d at 810. This Court also concludes that the Debtor had an initial burden of showing tax qualification to secure an exemption under *Section 8124(b)(1)(ix)*, which should have been a fairly simple matter to

50

show, notwithstanding that the overall burden of proof on the *Objections* rests with the Trustee/Trizec. *See, Fed.R.Bankr.P. 4003(c)*. This is particularly true in the present case, where the Debtor has not ever explicitly pled or otherwise relied on *Section 8124(b)(1)(ix)* so as to give the Trustee and Trizec any notice that such provision may be at issue

The above conclusion poses a problem for the Debtor, because there does not appear to be any evidence in the record to show that the C&G Plan is a tax qualified plan under the applicable IRC provisions. The Court scoured the transcript of the trial and could find nothing to indicate that the C&G Plan is qualified, nor do any of the Exhibits, including the excerpts from the Plan document that each side submitted, show that to be the case.[20] There is certainly reason to suspect that the C&G Plan may be tax qualified, but mere suspicion or speculation is not a substitute for evidence. Based on the evidence of record, the Court therefore has no alternative but to find that the contributions/gains related to the C&G plan are not protected by *Section 8124(b)(1)(ix)*.[21]

To sum up, the Court finds that the contributions/gains related to the C&G Plan are not exempt. The Trustee is not seeking the full value of the Debtor's interest in the C&G Plan, only that which he seeks to characterize as tantamount to fraudulent transfers occurring during the lookback period. The Court generally agrees with the Trustee that in principle he can make a recovery under a fraudulent transfer theory as he proposes. However, the Trustee cannot make a full recovery of the amount he is seeking.

---

[20]    Contrast the present case with *Oberdick*, where there was unrebutted testimony that the retirement plan at issue was ERISA-qualified.

[21]    Furthermore, even if *Section 8124(b)(1)(ix)* had been found applicable here, it would not fully protect the contributions/gains in any event based on the limitations contained in subsections *(A)-(C)* of the statute.

First, no recovery will be allowed for any "gain."  It is clear from the Trustee's own

Exhibit 30 that contributions had been made into the C&G Plan on behalf of the Debtor before the

lookback period ever started.  The first account document shows there was already a balance of

$73,840.95 in the C&G Plan for the Debtor as of October 1, 2001, none of which would be

recoverable by the Trustee because it pre-dated the lookback, which did not start until October 14,

2001.  All of the subsequent gains by the C&G Plan would necessarily have included some gains

attributable to this initial balance.  If the Trustee sought to recover gains related to improper

contributions, it was incumbent upon him  to segregate those gains  from gains related to the initial

balance.  As far as the Court can tell,  the Trustee has not done that, lumping all gains made by the

C&G Plan during the lookback period together into a single number.  Thus, the Trustee has failed to

meet his burden of proof with respect to any gains made by the C&G Plan.

Second, as to contributions, the Trustee is seeking recovery for contributions made

for each of the years 2002 through 2005.  The years 2002, 2003, and 2004 are not a problem, because

they are completely within the lookback period.  However, 2005 was a split year, with part of the year

within the lookback period and part outside of it.  The Trustee has not provided any information to

show when contributions were made within the year 2005, so the Court cannot determine whether

any or all of the contributions were made within the lookback period.  Furthermore, there was no

testimony to show whether contributions were made periodically each pay period, or in one lump

sum.  If the latter, it is certainly possible that the entire contribution for 2005 was made at or near the

end of the year, which would make it completely outside the lookback period.  Because of these

uncertainties, the Court does not have sufficient confidence to attempt any sort of *pro rata* approach

as to the contributions for 2005, and instead, finds that the Trustee has failed to meet his burden of

proof as to them.

The contributions made during 2002, 2003 and 2004 to the C&G Plan total $114,000.

The Court has previously found that the Debtor was insolvent during this period of time and/or could

not pay his debts as they came due.  The documentary evidence shows that the Debtor had the ability

to opt out of the C&G Plan, or at least the ability to seek such an opt-out, but he failed to make any

attempt to do so.  If the contributions had not been paid to the C&G Plan, they would have been paid

to the Debtor as earnings and been available to pay creditors.  Thus, the contributions of $114,000

constitute fraudulent transfers and may be recovered by the Trustee – however, only if the C&G Plan

is property of the estate.

Unlike the Debtor in *Oberdick*, the Debtor in the present case did not make the

alternative argument that the C&G Plan was not property of the estate pursuant to *11 U.S.C. §541(c)*.

In broad terms, that statute provides in Subsection (1) the general rule that the interest of a debtor in

property becomes property of the estate notwithstanding any provision in an agreement or by way

of applicable nonbankruptcy law that restricts or conditions the transfer of such interest by the debtor,

or that is conditioned on the insolvency or financial condition of the debtor.  That general rule is,

however, subject to an important exception, stated as follows:

> (2)    A restriction on the transfer of a beneficial interest of the debtor in a
> trust that is enforceable under applicable nonbankruptcy law is enforceable
> in a case under this title.

*11 U.S.C. §541(c)(2).*

53

The Court would not normally be inclined to consider an argument which a party has chosen not to make. However, the finding as to the C&G Plan will obviously have a significant impact on the Defendants, and furthermore, there is some indication from the district court that a bankruptcy court should perhaps consider whether a particular item of property is actually "property of the estate" even if the debtor has only raised exemption as an issue. *See, In Re Kieswetter*, 2011 WL 4527365 *3 at fn. 10 (W.D. Pa. 2011). Thus, even though the Debtor has not argued that the C&G Plan is not property of the estate under *Section 541(c)(2)*, the Court will consider that argument.

It can be seen that there are 3 major elements which must be shown for *Section 541(c)(2)* to apply. First, that there is a restriction on the transfer of the beneficial interest of the Debtor. That element appears to be met here based on the anti-alienation provision in Section 9.2(a) of the C&G Plan. Second, that the restriction is in a "trust." The Court is not aware of any evidence in the record to show that the C&G Plan constitutes or includes a "trust," although there are some references in the Plan documents excerpts that were admitted into evidence to a "Trust" and "Trust Fund," which at least suggests the trust element might be met.

The third element required under *Section 541(c)(2)* is that the transfer restriction be enforceable under applicable nonbankruptcy law. In the Court's experience, this element is frequently met by showing the restriction is enforceable pursuant to ERISA, as was done, for example, in *Oberdick*. However, the Court has previously found that the Debtor did not demonstrate the C&G Plan was "qualified" for purposes of *Section 8124(b)(1)(ix)*, and that same finding would apply with respect to *Section 541(c)(2)*. *Kieswetter, supra* (evidence regarding the validity of a

54

spendthrift provision would be the same whether determining an exemption or property of the estate).

Even though the Debtor cannot rely on ERISA to meet the requirements of *Section 541(c)(2)*, he may still be able to show that the anti-alienation provision is enforceable under Pennsylvania law, which would also be a potential source of "applicable nonbankruptcy law." *See, e.g., Velis v. Kardanis*, 949 F.2d 78, 82 (3d Cir. 1991) (applicable nonbankruptcy law under *Section 541(c)(2)* embraces state spendthrift trust laws). The Court is reluctant to make a determination as to whether the C&G Plan anti-alienation provision is enforceable under Pennsylvania law without hearing argument from the Parties.

In short, the Court has found that the C&G Plan is not exempt and that the Trustee may recover $114,000 in contributions made to the Plan during the lookback period. However, that finding is conditional on a further finding as to whether those contributions are property of the estate pursuant to *Section 541(c)(2)*. The Court cannot make that determination until it has heard argument from the Parties as to whether the record establishes that the C&G Plan is a trust, and whether the subject anti-alienation provision is enforceable under Pennsylvania spendthrift trust law. An argument date will be set by the *Order* accompanying this *Opinion*.

### *CONCLUSION*

For the reasons stated above, the Trustee may recover a total of $428,868.12 from the Defendants. An argument on whether an additional $114,000 of the C&G Plan contributions are

property of the estate which the Trustee should be permitted to recover, will also be scheduled.

Finally, a deadline for filing any motion for prejudgment interest will be set.  An appropriate order

follows.

Dated: March 26, 2013

_____
Thomas P. Agresti, Chief Judge
United States Bankruptcy Court

Case Administrator to serve:
     John Vetica, Esq.
     James Cooney, Esq..
     Debtor
     Neil Levin, Esq.